And we'll turn to the second case to be argued today, which is Sean John v. Whole Foods Market Group, Inc., 19-2528. Good afternoon, Your Honors. My name is Greg Blankenship, representing the plaintiff, and may it please the Court. Under Anderson v. Liberty Lobby, all that is required to defeat summary judgment is to proffer sufficient evidence supporting the claim factual dispute. That, plaintiff has done here. First, plaintiff's theory with respect to cupcakes is amply grounded in the evidence. Whole Foods has uniform computerized procedures and recipes that ensure that cupcakes are weighed and labeled in the same way. Therefore, if 33 packages of cupcakes at two different stores on two different days were all underweight by more than 20%, and if 10 packages of vanilla cupcakes in yet another store on a different day are also underweight, then it stands to reason that other packages of cupcakes made using the same computerized recipe and uniform procedures will also be underweight. Plaintiff's theory with respect to cheese is similar and also grounded in the evidence. Using a standard computerized procedure, Whole Foods employees cut a piece of cheese, place it on the scale, add a standard tare weight using the computer program, and then they attach the computer-generated label to the packaging. If 55 packages of cheeses at five different stores on different days were all underweight, it stands to reason that other cheeses at Whole Foods will also be underweight. And the reason is that Whole Foods uniformly fails to account for moisture loss when it's setting a tare, or the amount that is attributed to the packaging or things that are not actually the weight of the product. Defendant counters this well-grounded evidence by suggesting that human error is the reason all 33 packages of cupcakes were underweight and that Whole Foods doesn't leave its cheese on the shelf long enough for appreciable moisture loss. The question then on this appeal is whether the defendant's evidence of human error and the rapidity with which its cheeses are sold is so overwhelming that no reasonable jury could agree with the plaintiff that defendant's uniform practices resulted in underweighted cheese and cupcakes. And respectfully, the answer is that that evidence is not so overwhelming. So to get into the details a bit on cupcakes. Plaintiff has produced ample evidence that Whole Foods uses a computerized cupcake recipe and that it uniformly trains its employees to ensure that all cupcakes weigh the same. Testimony from seven executives and store managers, including Ms. Christy Taylor, testified that Whole Foods maintains uniform procedures at every store with respect to weights and measures. And three of those opponents, including Ms. Taylor, specifically testified that Whole Foods trains its employees to use standardized recipes for cupcakes. Ms. Taylor never once suggested in her testimony that these procedures were ineffective at preventing human error. And in fact, not a single one of defendants' witnesses ever suggested that human error was the cause of underweighting. And if they had, defendant most assuredly would have highlighted that testimony. Regarding the cupcakes, the district court cited to four proofs to support the human error theory. First was the testimony of Whole Foods employees. But the only person the district court cites to is Christy Taylor and specifically her declaration, which was submitted only on reply. But when I asked Ms. Taylor at her deposition if she could explain why so many packages of cupcakes were underweight, she confessed that she could only speculate as to the cause. True, that question was in the context of vanilla cupcakes, but it's reasonable to infer that if she were speculating about why a vanilla cupcake would be underweight, she would likewise be speculating about why chocolate cupcakes were underweight. And Ms. Taylor testified that she had not had any discussions with any Whole Foods employees regarding why there were so many underweight items found by the Department of Consumer Affairs. Yet somehow she definitively knew on her reply declaration that it must have been human error from under scooping batter or using too little frosting. That testimony is simply not credible. And I would respectfully suggest that it was error for the district court to have relied upon it without at least giving the plaintiff the opportunity to submit a surreply on the issue and potentially redepose Ms. Taylor. Second, the district court relies on its own lived kitchen experience. But, of course, there's nothing in the record about lived kitchen experience. And we're talking about a professional kitchen run by a large corporation using computerized recipes and uniformed training programs. We're not talking about home bakers. Third, the district court cites and relies upon the defense expert opinion of Dr. Offerman. But Dr. Offerman has no support for his conclusion that human error must have been the reason for underweighting. It's simply his ipsy dixit that is contradicted by the testimony of other Whole Foods employees. It certainly does not preclude a question of fact on this issue. Moreover, Dr. Offerman's conclusion is based on an erroneous reading of the record. He says it must have been human error because only two of 364 lots that were tested were underweight. Well, either he thinks that there were 364 lots of cupcakes tested. And we know that can't be the case because there could not have been more than 13 lots tested because they only test one product at each store and there were 13 store inspections. Or Dr. Offerman is referencing other products within those 364 lots. And all parties agree that the weight of one product is irrelevant to the weight of another type of product. And finally, the district court cites to the consent order between Whole Foods and the Department of Consumer Affairs. But, of course, that's just Whole Foods' self-serving statement in a settlement. It most certainly is not the type of evidence that's cognizable on summary judgment. Now, with respect to cheese, plain as evidence that Whole Foods' practices of not accounting for moisture loss is equally compelling. Indeed, Whole Foods executives admit that Whole Foods always knew that cheese loses weight owing to moisture loss and that the miscellaneous tear did not account for moisture loss because no one, including Whole Foods, ever accounted for moisture loss in cheese tears. Excuse me, you have a minute left. Thank you. Similarly, plaintiff's expert, Ms. Delperdeng, opines that the reason that the DCA found underweighted cheeses was because of moisture loss. Now, Whole Foods doesn't dispute that moisture loss occurs, and it doesn't offer any other explanation for why 55 packages of cheese were found to be underweight, more than the allowable deviance. Instead, Whole Foods contends that cheeses recently cut might not suffer appreciable moisture loss, and it speculates that all of the dozens of cheeses the plaintiff bought over the course of time might have been freshly cut when he was purchased. But the fact that all of the cheeses in the audit test, that's the second test that the DCA inspectors conduct, all of those were under by more than the allowed variance. And this disproves the theory that some cheeses might not sit out long enough to experience moisture loss. If most cheeses are left out only two to five days, and that's not enough for appreciable moisture loss, then it stands to reason that at least some of the cheeses in the statistical test would have passed. In other words, defendant's theory might explain why one or two cheeses in a lot might be under, but an inspector might just happen to grab the one or two that were under in the audit phase. But we would expect that most of the rest of the cheeses in the audit test would have passed. The fact that every single package in all seven lots were found to be underweight is a strong condemnation of that theory. And as we laid out in our brief, the district court conclusion that cheeses are only left for two to five days is contradicted by the record. And I'd refer the court to the confidential appendix at 108, where Mr. Manka testified that it's actually a week that cheeses are cut for. And with that, I believe that I'd reserve the rest of my time. So I'd be happy to answer any questions that the court might have. Thank you very much, counsel. Judge Laurier? Yes, Mr. Blankenship. Let me start with a broader question, and then I'll get to at least cupcakes. With respect to the standing issue, and I'm familiar with this case having been, as you know, on the prior panel. Is it right that you are now relying on the theory that Whole Foods had unitary practices and procedures that systematically resulted in underweight cupcakes and cheeses? And that you're no longer arguing, as I think you did the first time, that you can establish or that Mr. John can establish standings simply based on the claim that a higher percentage of the Whole Foods prepackaged products were underweight? It is most certainly correct, Your Honor, that our theory is that the unitary practices are the reason why plaintiff can – plaintiff argues that he was injured. When we were on the motion to dismiss, obviously we didn't have any discovery, and it was our view that because the DCA had indicated that there were such a large number of underweighted products that it was plausible that plaintiff also purchased an underweight product. We are not – we are most certainly not arguing that you can simply make a statistical extrapolation between the number of disparate products that the DCA found to say that, well, all products must have, therefore, been underweight. Rather, all we're relying upon is the simple fact that we know that a number of cupcakes and cheeses were underweight, we know that there were unified practices, and it's the unitary practices that draw the link between the test of the DCA to plaintiff's injury. It's not a statistical or probabilistic extrapolation. Okay, that's helpful to know. So it's a different theory of standing that you're espousing at this stage, understanding that we're at a different stage now at the motion to dismiss. And with respect to cupcakes, I know you spent some time discussing the Taylor – and attacking the Taylor declaration, but why doesn't the fact that the DCA found differently weighted cupcake packages doom or undermine your theory that Whole Foods' uniform procedures produce uniformly weighted cupcakes? Well, thank you, Your Honor. I think the answer is that all of the cupcakes that were weighed were more than 20 percent underweight. True, some were more, you know, a little bit – were more or less under that – were more under that 20 percent than others. But it would – it's not drawing reasonable inferences in the plaintiff's favor to say that if all cupcakes were under 20 percent, some more under 20 percent than others, that, therefore, there could have been some cupcakes that were overweight. I think the fact that – But your argument rests on the uniformity, that is, uniform procedures producing uniformly weighted cupcakes. Does it not? It is, Your Honor, but I would suggest that the difference between how much greater than the – under the 20 percent the cupcakes were is simply a reflection of the fact that, you know, is why there are allowable deviations. Nobody suggests that, you know, when anybody's weighing things, they're going to be exactly the same to the micron. There are going to be some differences, and that's why there's a maximum allowable deviation to account for that fact. And I think it's reasonable to infer that the differences under that 20 percent were within that, you know, maximum allowable deviation. But if all we know is that cupcakes were all under 20 percent, it's – I would suggest that it's not reasonable to infer that there could have been other packages that were, you know, that swung 20 percent the other way so that they weren't underweight, given that the variations were not in that 20 percent range. Okay. Thank you. Judge Menache? Yeah, so can you clarify your contention about when Whole Foods calculated the declared minimum weight? Is your contention they did so fraudulently? Your Honor, we don't have any basis one way or the other to say whether it was fraudulent. It could have very well been an error in programming or, you know, somebody wrote down, you know, when they did the testing of the recipes to see how much the weight was, they just reached the wrong conclusion. You know, we don't know. It's curious, to say the least, that Whole Foods was unable to produce any discovery about the process by which it went about actually weighing the cupcakes to determine what that declared minimum weight is. But there is no discovery, at least as taken to date, that indicates whether it was intentional or a mistake or just a computer error. But I guess under your argument, it has to be either a mistake or something intentionally fraudulent, right? If by mistake you mean a mistake in the way that the computer is programmed to spit out the declared minimum weight, then I think that's correct, Your Honor. Oh, so you think that probably they baked a bunch of cupcakes and the computer that weighed them was weighing them in properly? Well, Your Honor, again, there's very – Whole Foods was unable or didn't produce much of any discovery regarding that process by which they, you know, determined what the recipe was supposed to have come out with. It could be that the person who programmed the computer to print out the declared minimum weight made an error. It could be that there was an error in, you know, how the results were then turned into declared minimum weight. Perhaps it was intentional. There's no way to know. But what we do know is that there are uniform practices in place, uniform recipes, extensive training to make sure that those are all followed. Indeed, that's the reason the procedure – Right, right. I guess that's my question. So if there's uniform practices – I mean we have – the district court explained that the way they calculate the declared minimum weight is they make several batches of cupcakes according to the recipe, and they weigh them. And then they record the declared minimum weight. So isn't it the case that either there were some batches of cupcakes that were above the declared minimum weight when they did this, or someone is departing from the uniform procedures and practices? Well, it's not – I don't believe so, Your Honor. I think the answer is that there – the answer is what Peter Ormon testified to, that if there's an error in the data, including, for example, error in the data that's used to print the labels and determine the declared minimum weight for cupcakes, then that error will be multiplied across all the stores. Whether that error is a result of intentionally using a lower declared minimum weight – Wait, but if the computer is printing out the wrong number, that could be in one of the stores and not in other ones, right? That could just be defective equipment. No, Your Honor. I don't believe so. All of the evidence in the case is that there is a uniform computer system. Nobody has ever testified that the computers in different Whole Foods areas have errors. And the fact that there were three batches of cupcakes in three different stores that were under 20% – Yeah, but you just told me a moment ago when they did the initial batches to calculate the declared minimum weight, there could have been an error in the calculation. So why is it possible that there was an error there if you're saying if there's an error across all of Whole Foods, it has to be uniform? So you're saying when they baked the cupcakes to decide the declared minimum weight, there might have been an error that was limited to that computer, but when they calculate the weight at the individual stores, there could not be an error that was limited to that computer. Is that what you're saying? No, Your Honor. I don't think I was clear, and I apologize for that. When Whole Foods determined what the declared minimum weights for cupcakes were, that doesn't happen in each store. Each store doesn't have separately programmed computers. That happened in corporate headquarters at some point where Whole Foods developed the recipe and then decided what declared minimum weight it was going to attach to that recipe. That happened one time and one time only, and that was then used to program the computers that are used in all of the stores. But I guess what I was saying is since you were saying that maybe the way we got Whole Foods arrived at an incorrect declared minimum weight is because the weighing machinery weighed the product incorrectly, that maybe that's some kind of an error that might happen at other stages of the process or other stores that might account for underweighting. Well, I think what I'm suggesting, Your Honor, is that kind of error, that error, the initial weighing, that could have been an error that happened that one time I mentioned when it was initially determined at corporate headquarters or wherever that happened. That might have been one of the causes. It could also be that when the person programmed the computer, which is the same computer that all the stores use, the same computer program, that they misprogrammed it and it resulted in the wrong weight. It could have been intentional. Again, we just haven't had – there's apparently no evidence. But just putting aside the possibility of intentionality, like some kind of fraudulent scheme on the part of Whole Foods, your argument does seem to require that either there was intentional fraud or there was a serious departure from the procedures and practices of Whole Foods and somebody – I think that's right, Your Honor. Or it was an error in whoever programmed the computer once they declared minimum weight. So then if the record reflects that there was a serious departure from – based on human error from Whole Foods' procedures and practices, then why is it that when we talk about the procedures and practices at the individual stores, it's not credible to say that you haven't shown that there's no human error, that the practices were so tight as to preclude the possibility of human error? When, in fact, your argument depends on there being at least one serious human error to begin with. Because there's a difference between the human error that might have occurred at corporate headquarters or in computer programming when the uniform system was being set up in the first place versus human error that occurs by employees. What do you think that what they're doing at headquarters in the conditions of a lab because they're setting a policy for all the stores, that that would be subject to many more controls to guard against human error than what they're doing when they're baking cupcakes at every individual store across the country? I'm confident that if that were the case, defendant would have been more than happy to proffer evidence that they actually did a great job in the first instance of figuring out what the declared weight was and programming it. And I think it's notable that the defendant has not produced any kind of evidence. There's nothing in the – the only evidence in the record about how Whole Foods follows uniform procedures has to do with the training of employees and the fact that the computer spits out the same uniform declared minimum weight label. There's nothing to suggest that Whole Foods is incapable of error at its corporate headquarters. And the fact that there were so many errors – So your argument is that you put in lots of evidence that they have very strict procedures that guard against human error at all of their stores, but it might very well be the possibility that at corporate headquarters, when they're setting weights in the lab, they do not have very strict procedures that guard against human error and that there's lots of human error occurring. Well, I don't know if there's a lot of human error. There – There's at least one serious human error that happened. Yeah, I agree. Okay. All right. Can I ask also about the – about the cheese? So I take it that your argument about the cupcakes is such is that the recipe was incapable of producing a cupcake that was properly weighted or overweight, right? So like – so every package that reached the shelves would have been below weight, right? That's your argument? I think that's a fair characterization, Your Honor. But then with respect to the cheese, you don't disagree that at the time the cheese is cut, it's properly weighted. It's just that after a moisture lock, it is below weight, right? Because the tear only accounts for some of it. I think that's also a fair characterization, Your Honor. Right. So then on the argument about the cheese, then even if it's a minority of cheeses, there's at least some number of cheeses that are on the shelf at some time that are properly weighted, right? Because right after it's cut and labeled, it's properly weighted. Well, Your Honor, I don't think that there's any evidence in the record that any of the cheeses that by the time a consumer actually buys them haven't suffered a periodical moisture loss. And I think the fact that seven different lots and 55 different packages of cheeses were all underweight by more than the allowable deviation demonstrates that factor. It certainly creates – I know, but your argument to explain those facts, though, is not like the cupcake argument that there's some kind of recipe that yields a product that is always underweight. Your argument is that the tear doesn't account for the moisture loss, and so after some period of time after it's cut, it's going to be below weight. But your argument assumes that it's going to be properly weighted at the time of cutting because there isn't moisture loss at that time. So there's going to be at least some cheese that's put out that's properly weighted. Wouldn't that just naturally be the case, even if it's a small fraction because maybe most cheese sits out for a while? I don't know how long it sits out on the shelf, but there's going to be some cheese that's properly weighted, right? That's a theoretical possibility, I suppose, but again, there's no evidence that that ever happened. And if that were more than a very small fraction of the cheeses, you would have expected that not all of the – not every single package of the seven lots – I understand, but it's just that you said a moment ago in your argument that you're not relying on any statistical extrapolation. And what I'm just pointing out is for the cheese, at least, you are relying on statistical extrapolation. You're just saying that the overwhelming majority of the cheeses would be underweight because of moisture loss. Your Honor, I agree that there's a difference in our theories of cupcakes versus our theory of cheese. But as Judge Bosner noted in a case cited by the district court, ultimately all evidence is probabilistic. The question is whether a jury could reasonably infer that it's more likely than not that some of the cheeses that Mr. Sean John bought over the course of many, many months and dozens and dozens of purchases might have been underweight. And the fact that all of the cheeses – No, I understand, but we're talking not just about what a jury could find on the merits, but also whether you've established an injury for standing too. And the injury has to be nonspeculative. But I think you've just said it's possible that Mr. John bought cheese that's overweight. You just think it's unlikely. Your Honor, I don't believe – I think that at this stage of the litigation, I don't believe that there's a difference between the inquiry in terms of whether a plaintiff has established injury for the statutory claim and injury for standing. The question is ultimately – we're certainly not at a motion to dismiss state, so I agree we have to show more than is just plausible. But just like a plaintiff doesn't have to show to 100 percent certainty that the reason why he slipped and fell on a piece of – slipped and fell was because of a piece of ice, juries and judges can draw reasonable inferences without knowing to 100 percent certainty that something is the case. If plaintiffs had to prove causation by 100 percent without any chance of their theory being incorrect, no plaintiff would ever have standing for any claim. That's fair, but do you agree that it has to be nonspeculative? There has to be a basis for concluding that Mr. John actually did purchase underweight cheese? I would – yes, Your Honor. I would agree that if all we have is speculation, that would be insufficient. So if we were back at the motion to dismiss stage, I know that the true percentage is not 89 percent, and it's more complicated than that. But let's assume that all you had shown at this stage was that 89 percent of the products were underweighted, which means 11 percent were overweighted. Would that be – and that's what you had established. Would that be enough to show injury? Or does it have to be more than probabilistic? I think that that would be enough to show injury, Your Honor. I think all the cases cited by the defendant and the district court for the notion that there has to be direct energy – sorry, direct injury are all cases where there is a substantial question about whether – what percentage or how much of the group of products actually has some kind of defect. And that's not the case. So you agree that Mr. John might have bought properly weighted cheese. You just think that the odds are against that outcome, and so a jury should decide. I wouldn't – respectfully, Your Honor, I wouldn't agree with that. I think the fact that every single piece of cheese that has ever been tested – there is zero evidence that any cheese is ever, ever not properly weighted. I think that puts us over the bump of being probabilistic or percentage and puts you into certainty. If Whole Foods had some evidence that any of its cheeses, any of its cheeses were properly weighed, that would be one thing. But it hasn't. It hasn't proffered anything to support the notion that every single one of the cheeses – And so then they would have to show that the recipe is capable of producing over-weighted cupcakes. But on the cheese, I think you agreed with me that even your theory acknowledges there are at least some properly weighted cheeses. But I think we're – I think I have the argument. So unless there's something else you want to say, I think I'll stop. No, Your Honor. Thank you. Thanks very much. Let's hear from counsel for Whole Foods. Thank you very much, Your Honor. Good afternoon, Your Honor. May it please the court that David Salinger for Whole Foods. The decision of the district court should be affirmed. Appellant has not offered any competent evidence that he purchased a single package of cupcakes with cheese that was short-weighted. First, on the prior appeal, John argued that 89% of all the products tested by DCA did not meet the MAV and were misweighed. And the questioning just now went to the results of the DCA. But the discovery in this case has shown that the claim in the DCA press release has been thoroughly debunked. The 89% number does not mean that 89% of all the items tested by DCA were misweighed. All the 89% number means is this. When the DCA inspectors found at least two packages of an item on the shelf were materially underweight, and then reweighed that lot a second time, 89% of the packages in those lots being weighed for a second time were materially underweight under the federal standards. I cite to the deposition of James Hurst, who is the DCA Director of Enforcement, in the Statement of Undisputed Facts at page 266. The DCA and Mr. Blankenship just talked about the results of the statistical analysis, which is what the DCA number is about. The DCA number is based on a cherry-picked subset that included only lots that had failed the initial audit test. It did not take account of any of the lots that passed the initial audit. Second, Mr. Blankenship claims that he's not... Mr. Selzer, would you speak up just a little bit? Yes, you are. I beg your pardon. I'm going to turn up the sound, and if it's too loud, please tell me, and I'll turn it down. Mr. John's claim depends upon impermissible extrapolation from the DCA inspection notices. John claims that he's not extrapolating, but without extrapolation, there is no evidence of any errors at all. Ms. Delperdang, who was John's own expert, testified that it is improper to extrapolate from DCA notices of hearing. I cite the panel to the appendix, page 851 to 853. She testified that the DCA notices only applied to the lots tested in those stores. Each violation in those notices relates to one lot in one store on one day. Ms. Delperdang said the notices do not show the probability that a large percentage of prepackaged items were underway. All the notices show is that for one lot in one store on one day, there was an error. There's no credible evidence to extend that error to any other lot on any other day at any other store. And to do that is a pure guess, which is not enough to defeat summary judgment. And that's all my opponent has proposed to do. Third, John has failed to provide any non-speculative evidence of any uniform practice that will result in all chocolate cupcakes or all packages of cheese being this way. The DCA did not find a single shortweight package of cheese or cupcakes at either of the two stores where Mr. John shot. Other than argument, John has not offered any facts at all to connect the DCA notices with his theory of uniform practices. DCA acknowledged in the consent order that it did not find any systematic violation. With respect to the cupcakes, there were only two lots of chocolate cupcakes found shortweight after all the inspections of the Whole Foods stores in New York. And those are at two other stores where Mr. John didn't shop. As Judge Lohier just pointed out, John's theory of a uniform error was contradicted by the DCA inspection results themselves, which show inconsistent errors on the two lots of chocolate cupcakes. They come out with different weights. That is not evidence of a uniform practice which results in a uniform error. There was no testimony that there was a uniform error in the weighing of the cupcakes. No document in this case ever showed any data error with the cupcakes. There was never any testimony suggesting that the recipe produced a shortweight cupcake. No one on the plaintiff's side ever tested the recipe. There were no facts suggesting that the declared minimum weight, about which Your Honor Judge Lohier just inquired, on all the packages was incorrect. What the evidence shows was that the weights were incorrect on those two lots. It is not that the declared minimum weight was an incorrect declared minimum weight for a package weighed in accordance with that recipe. With respect to cheese, most significantly, there's no way to know if John purchased a package of cheese that had experienced moisture loss. Moisture loss occurs over time. If a customer purchased freshly cut cheese soon after it was put on the floor, as Your Honor just explained in your questioning, that package would not have experienced any moisture loss at all. John has no way of knowing how long any piece of cheese he bought had been in the store before he bought it. Weighing errors were found with respect to cheese in only seven individual lots of cheese out of all the stores in New York City. None of those was at either of the stores where John shopped. Whole Foods always had a miscellaneous tare that always accounted for moisture loss. There was no evidence of any uniform error regarding how Whole Foods accounted for moisture loss that would support the inference that John bought a single package of cheese that was misweighed. And even if there was moisture loss, as Judge Engelmeyer pointed out, there was no evidence that it would have been enough moisture loss in any package of cheese to overcome the miscellaneous tare. Ms. Delperdang, a plaintiff's expert, said, the only way to know if a package of cheese had experienced moisture loss is to weigh the package. And we submit that under the post-discovery heightened standard for standing, John has to show specific facts of injury in fact, and that he has not done. Now I would like to address some of the points that my opponent just made. He talks about human error and his view that we hadn't established that it was human error. We submit that we don't have to address that issue and we don't have to prove there was human error. We accept for purposes of this appeal that DCA found errors in the specific packages that they weighed in the specific lots in those stores on those dates. But it doesn't matter what the cause of the error was. It doesn't matter how you explain it. The reality is that what Judge Engelmeyer ultimately ruled, and the only thing he ruled, is that John hadn't shown any evidence of a uniform error that would permit the inference that he was asking for, which was that there was a uniform practice that resulted in the underweighing across the board of cheese and cupcakes. That he didn't show, and in fact, he didn't show any evidence that would get you to that point. Judge Koubanas, with your indulgence, may I just ask a quick question? Yes, of course. When you say uniform error, is that different from a system-wide error? Yes. Whether he's describing it as a uniform error or a system-wide error, that's what I'm saying. There is no evidence in the record that there was any uniform error. All there is in this case, Your Honor, is evidence that they found two lots of chocolate cupcakes that were misweighed for whatever reason. It doesn't matter. We accept that they were misweighed. And seven lots of cheese that were misweighed for whatever reason. And we don't know the reason, and we accept that those were misweighed for purposes of the appeal. But my opponent talks as if there was, in fact, a computer error that caused all these errors. There's nothing in the record on that. And there's nothing in the record that says that the recipe was incorrect. Or there's nothing in the record that says that the minimum declared weight on the chocolate cupcakes was incorrect. There is evidence that those two lots were weighed incorrectly. Why, we don't know. Excuse me. You have a minute left. Thank you very much. He mentions the testimony of Ms. Taylor and Mr. Opperman. We submit you don't have to address in any respect any of those people's testimony because it doesn't matter what the error was. Just like it doesn't matter whether Whole Foods knew about the fact of moisture loss or not. We accept that moisture loss ultimately occurs over time. But in the period in which Whole Foods cheeses are sitting on the shelf, which is two to five days, there was no appreciable moisture loss. And Whole Foods did this informal test. And if you look at the informal test within the first week, it shows that there's no appreciable moisture loss with respect to any of those cheeses. My opponent just argued very strongly with respect to the cupcakes that all the cupcakes that were weighed were more than 20 percent off. That fact is totally untrue. And there's no way that you could read the testimony of Director Hurst on the DCA methodology that could remotely get you to the point that the statistical analysis governed all the products that were weighed and they failed to include in the statistical analysis test any of the cheeses that were successful and passed the audit test. So that whole evidence, which is a major argument for the appellant, is of no weight because it doesn't mean anything. It means the packages of cheese that we already found were underweight or still underweight when we measure them in a different place in the room. I mentioned in response to one of your questions this issue about system-wide error. The testimony of Peter Ormond did not indicate that there was any system-wide error. He testified about a hypothetical question. He said if there were a data error, it would affect all the items. But he never said there was a data error. He was questioned at length and there was no testimony anywhere in the record that there was a data error of any kind in any computer. My opponent says in response to the panel's questioning that he's no longer arguing that it's simply statistical extrapolation. But it's clearly extrapolation because without the DCA results, he doesn't have anything to argue over. And it's clearly based on statistics. And the statistics are really very meaningful as recognized by DCA when their own people, before they issued the Whole Foods report, that ultimately led to the 89% number in the press release, questioned the reliability and the fairness of using that number where it only took account of one subset, which was the subset of packages that had failed and it didn't take account of the packages that had passed. So, we're just going to- Judge Cabranes, for a moment. Yes, Your Honor. May I ask the clerk, has the time expired here? Yes, Judge, it has. Okay. Let me just ask my colleagues if they have any questions for counsel for Whole Foods. Any more questions? Judge Cabranes, I have just two brief questions. First, just so that I understand the parameters here, Mr. Selinger, do you agree with Judge Engelmeyer that if Mr. John can establish a uniform practice, system-wide practice, a unitary practice, however you want to describe it, that systematically produced short-weight cupcakes and cheeses, then he can get to a jury and has, at least at the sub-adjustment stage, established injury in fact? Yes, Your Honor, I do agree with that. Okay. And what Judge Engelmeyer said was that there was no evidence other than speculation that he offered that would get him to that point. No, I understand. I understand. I just want to make sure that we agree on basic principles. Yes, of course. Understanding that there's the discussion about the evidence or lack thereof. My second question is that, and I think you were referring to the cheese part of this, not the cupcake part of this, but regardless, so Mr. John argues that the discrepancy of 20% is large enough to support the inference that more than just human error was at work here. Why shouldn't a jury decide whether a system-wide uniform unitarity, whatever description you want to use, system-wide or uniform error recipe, or the declared minimum weight on the one hand or human error on the other hand was responsible for that significant discrepancy? I'm not sure what your question is, Your Honor. So he argues that the discrepancy of 20% is large enough to support the inference of more than human error, right? That that was – that it's something more than human error was at work. Why shouldn't a jury decide whether a system-wide error in the recipe or the declared minimum weight on the one hand or human error on the other hand was responsible for the significant discrepancy, the 20% discrepancy? Your Honor, two points I would make. Number one, the consistent lessons of all the cases, if I start with the Anderson case or any of those cases, is that conjecture or speculation doesn't overcome a well-supported summary judgment motion. And all he's arguing here is based on conjecture and speculation. With respect to the weight disparity in the individual packages of cheese that were weighed, you can't extrapolate. So we have a record where the only evidence on the point about extrapolation is Mr. John's expert, who says it's improper to extrapolate, our expert, Henry Opperman, who says it's improper to extrapolate, and the DCA's own director of enforcement, who says you can't extrapolate. I would never do that. So we therefore submit to you, Your Honor, yes, there were these seven lots of cheese that were misweighed. Mr. John didn't buy one of those seven packages of cheese. So those plaintiffs who bought those seven packages of cheese are not here. We don't know anything about it, and we don't know what the cause was of the error. But whatever the cause, you don't have to address that issue. Because Mr. John hasn't offered anything that connects those seven lots to his theory that it must be a human error. We submit that that is just a bridge too far, and the only way you can cross that bridge is based on speculation that you would say, yes, there must be a uniform error. But there's no reason to think that that same error, whatever caused it, happened in any other lot at any other store on any other day. And that's what all the witnesses who testified on that point in this case said. One final question, at least on my part, Mr. Salinger, is that the district court in its decision relied on its, quote, lived kitchen experience, close quote, to reject Mr. John's theory for the cupcakes. Is that appropriate? And what do we make of that? Isn't that something that a juror, not a district court judge, should consider in determining whether Mr. John's claim here lives or dies? Your Honor, the way I read Judge Engelmeyer's decision, he was simply saying that the other explanation is consistent with commonsensical lived kitchen experience. But he was not comparing the equities and weighing on one side, was this a uniform error, and on the other side, was it a human error, and then coming down and deciding as a matter of fact it was human error. All he was doing is saying, John hasn't offered me any fact other than speculation that this was caused by uniform error on that side. On the other side, I have Chrissy Taylor's testimony, I have Henry Opperman's testimony, I have DCA's acknowledgment in the consent order that there was no systemic violation. I have all of those things, and my own experience is consistent with that. But he wasn't saying I'm relying on my own experience, he was simply saying properly, we believe, that Mr. John hasn't shown anything other than speculation to support his guess that there must be human, I'm sorry, there must be a uniform or system-wide error. Do you agree, by the way, Mr. Salinger, that we do not need to, in order to affirm, deal with this issue that was raised of statistical extrapolation and the propriety or impropriety of that? You do not need to decide that, Your Honor, because there's, again, you would only need to decide that if you decided that you were going to rule contrary to what all the witnesses said. But you don't have to get to that issue. The only issue is has Mr. John, who has the burden here, shown any basis for you to think that it's proper to infer that there was uniform error, and he hasn't. Thank you. Thank you, Justice Kubanis, for your indulgence. Great. Judge Menasci, any final questions? Yeah, yeah. So you said earlier that you don't think that there's evidence of uniform error, but you don't dispute that there's evidence of uniform practice, right, that there's a standard recipe for the cupcakes and that all the stores follow that recipe and the procedure, right? I do not dispute that there's a uniform practice, and I do not dispute that Whole Foods people are schooled in the uniform practice and are supposed to follow the uniform practice and are given recipes, and it's the same recipe in all the stores, and they each bake them individually in the store. So there's no dispute about that. The issue that I think – Right, right. So if there's a uniform – and then the other point you made was that it's not accurate to say that there was only the cupcakes that were measured to be underweight. And it's true that the DCA, if they weighted something that was properly weighted or above weight, they didn't record it, and so they might very well have weighted a bunch of products that were above weight. But it is true that the only evidence in the record of weight that we have of the cupcakes were below weight by 20 percent or more, right? Yes, Your Honor, but you're talking about two lots, one lot in each store out of the thousands. Yes, there is, and I believe you were the one who asked my opponent in the questioning about the testimony. He said there was no evidence, and there was lots of evidence about that. On your point that John basically argues that the recipe could produce these different results, he could argue lots of things, but there's no evidence. There was not one fact in the record that suggests that doing that recipe properly produces a mis-weighed cupcake that is different than the minimum declared weight. There was ample evidence in the record that during the product development process, Whole Foods really makes an effort to get it right, and bakes as many batches of cupcakes as they have to, and weighs each of the cupcakes, and takes the cupcake with the lowest weight of all of those cupcakes that they've baked, and sets that as the minimum declared weight. Okay, so you're telling me that, so that's fair, so then that would be evidence of an application of this recipe that led to an above-weight cupcake. So, you know, I take it that Whole Foods just described generally the process by which they decide on a minimum weight, but is there evidence that shows that when they calculated the declared minimum weight for chocolate cupcakes, they baked a number of batches using this recipe and generated properly weighted cupcakes? Yes, the testimony of Christy Taylor was on that precise point, which was about how we come to the minimum declared weight. That's what she was questioned about. I sat opposite Mr. Blankenship for a whole afternoon when we went through the recipes and the baking process, and he asked her, how do you know about, you know, what is the minimum declared weight and how do you get there? And she told him, this was not an abstract discussion about taking, you know, products in the abstract. The questioning was mainly about cupcakes. It was also questioning about other products, like the loaves of bread that were baked in the Stanford, Connecticut store, where she said they had a consistent problem with shrinkage, which they couldn't figure out. And they finally went in and they realized that the loaves of bread that they were baking in that store, and that would have been with a standard recipe too, the loaves of bread were coming out, I believe, 25 or 50 percent heavier than they were supposed to be. So the customer was getting more than he was supposed to. There is evidence in the record of individual human error. All our position is is that this court doesn't have to decide that issue, and Judge Engelmeyer didn't decide that issue. All he decided was that other than theory, conjecture, speculation, Mr. John hasn't offered— admittedly follows uniformly, has led to a cupcake that is at least 20 percent underweight. But I think, you know, as you pointed out, I was focused on this question about the declared minimum weight. So if there's evidence in the record that indicates that Whole Foods followed the recipe and generated an aboveweight cupcake, then that might be evidence pointing in the other direction. But if the only evidence we had was any cupcakes that were generated by this recipe fell below the weight, you could see how that would suggest that all the cupcakes were below weight, wouldn't you? Or would you still think that would be an impermissible inference? Your Honor, we would submit, based on really the undisputed evidence of witnesses on both sides, that you can't extrapolate from a DCA inspection result of one lot in one store to any other store, even as—not only as to a different product, but even as to the same product. I believe that's what Ms. Delberding also said in her testimony. And therefore, I agree with you that the only evidence of specific weights that exist in the record of the DCA weights that they measured—but again, we're talking about two— Yes. Yes. No, that's not a direct measurement, but it's— I don't have a direct measurement. I have the testimony of Ms. Taylor, who in response to my opponent's questions, I believe, testified about the bakery product development process and how they did the declared minimum weight. When I was agreeing, I was simply saying the only numbers that we have of cupcakes that were on shelves or weighed were these two lots. But again, I would point out, there are two lots, one in each store, out of all the stores, and you can't extrapolate. But if we're making inferences as to the non—you know, in favor of the non-moving party, if we know that you followed the same procedure to generate all these cupcakes across all the stores, and we've measured 24 of them, and they're all 20% or more underweight, why is it an extrapolation that other ones would have been underweight? Why isn't it just a conclusion that the way this recipe works is it generates cupcakes that are 20% or more below the declared minimum weight? Your Honor, there would have been an easy way for him to prove that, which would have been to have taken the recipe to a lab and basically baked a dozen cupcakes and seen how much they weighed. There was no evidence in the record whatsoever. Well, but aren't you moving for summary judgment? So isn't it your obligation to show there's no dispute of material facts? Why didn't you do that? Right, that this is a dispute of material fact. We accept that these two lots— So then why isn't that a dispute of material facts as to whether this recipe is capable of generating a cupcake that is properly weighted or above weight? I can't imagine how that question could properly get to a jury without some connection that would tie those two lots to the theory that that must somehow be a uniform error. And there was testimony in the record, Your Honor. No, I understand, but that wasn't my question. Let's forget about the two lots for a second. Let's say all we had was the testimony that you follow a uniform system for baking the cupcakes. And they say this recipe can never result in an above-weight cupcake. And you say, oh, yes, it can. I mean, that's a dispute about how the recipe works. And so wouldn't someone have to show whether it can or can't? And how do I decide on this record that that dispute is resolved, that there's no ongoing dispute about that question? Well, what I was about to say was, I believe that this would be germane, is there was testimony about even with uniform practices and even with uniform methods, everybody doesn't get it the same. And we had testimony from Henry Opperman, the weights and measures expert, about how different people may hear instructions differently. Their level of attention may be different. They may follow instructions differently. I think those are all consistent with Judge Engelmeyer's observation that on the other side, he has his lived kitchen experience. I understand that. And I think that that's a normal observation to make, that human beings are implementing the recipes and they're not all going to be exactly the same. But I think you would agree, if the declared minimum weight was something that was very high, let's say it was, you know, 100 pounds, I think you would agree that this recipe would not be capable, no matter what the level of human error of ever generating a batch of cupcakes that meets that weight threshold. So there is a point at which we can say there's a question as to whether the recipe is capable of reaching a certain weight, isn't there? That is at some point a fact question. Yes, but not just based on conjecture. There was no testimony that the declared minimum weight was in any respect incorrect. No evidence whatsoever in the record of that. Our view, Your Honor, and I was listening to your questions of my opponent about the computer issue and all that. Our view is it doesn't have anything to do with the computer issue. It has to do with that. Those cupcakes were baked in store by some person in that store. And we don't know what he did. But it wasn't anything in the computer. It wasn't anything in the label. There was no testimony about the number about, you know, the declared minimum weight was off. The problem with that particular lot was that it didn't weigh what it was supposed to. Okay, I think we've had our cupcake treat today. Mr. Blankenship, do you want to take 30 seconds? Yes, Your Honor, and I appreciate that. I would just simply point out that I think that the defendant's concession that it doesn't want to or can't defend the notion that human error was the causes of the cupcakes being underweight is fatal to his position. The only basis by under which the district court rejected the plaintiff's theory that uniform practices were in place and therefore some cupcakes were underweight, all cupcakes were underweight, was human error. That's the only thing that the district court pointed to to counter the evidence that the plaintiff had proffered. And I think we've done a pretty thorough job of going through all that. The other thing I would just like to briefly point out is that Mr. Selinger seems to imply that there must have been some cupcakes and cheeses that passed the initial audit test. But that's just rank speculation. There's nothing in the record that supports that claim. And there, in fact, is information in the record contradicting that claim. Both the district court and the defendant agreed that a lot is all of a particular product in a store, meaning that when they test cupcakes, they don't just have some cupcakes on the shelf and some cupcakes they don't take. They take all of the cupcakes from the shelf and they tested it. And we know… Thank you very much. That's fine, Mr. Blankenship. Thank you, Your Honor. It's your breath. Let's all catch our breath. This is very good. Thank you very much. We'll reserve decision.